Would you please call the first case for argument? 19-2517 from North Dakota Breanna Berndsen et al v. North Dakota University System All right, Mr. Siegel, we'll hear from you first. Thank you, good afternoon and may it please this honorable court I am pleased to represent the plaintiffs and appellants in this matter which in my view provides this court with a case of first impression among the circuit courts of appeal in the United States and the question for the court is pretty straightforward from my perspective the court is simply being asked to answer the question of whether the three-part test established in a 1979 policy interpretation by the office for civil rights provide the sole basis for determining whether there is a violation of Title IX's provisions against sex discrimination we believe that the answer to this question is a strong and clear no for several reasons first of all the three-part test is not required by the statute itself 20 U.S.C. section 1681A as the respondents point out is a short simple statute that simply provides that recipients of federal financial support may not discriminate on the basis of sex it does not provide a means for determining such cases of discrimination and I would submit that it is analogous to laws which prohibit sex discrimination employment such as Title VII and as we have seen over the years the courts have devised various methods for evaluating and proving claims of sex discrimination in this case additionally second reason is that the three-part test is not required by the regulations that congress required the department of health education and welfare to promulgate in 1974 these regulations are entitled to chevron deference and these regulations require not only equal opportunity for men and women but as stated very clearly in 34 CFR 106.41 they require equal opportunity not only in terms of how many young men and women will participate in athletic endeavors but also requires the office for civil rights but also courts hearing these claims to look at issues having to do with the selection of sports and the levels of competition and those are clearly not issues that are required or even addressed by the three-part test so counsel I have a question so isn't the sufficiency of the pleading here really dependent upon whether the contact sports provisions of the 79 policy interpretation whether they're given the same deference that the three-part test provisions of the same policy interpretation are given your honor I think that's certainly one of our contentions but more broadly I would frame it this way which is that if we're looking at the three-part test and determining that it has usefulness to the courts for evaluating claims under title nine I believe we should not be picking and choosing as respondents would have the courts do the three-part test as well as the requirements that the court assess opportunities for participation in different kinds of sports including but not only contact sports and also assess levels of competition are equally part of the 1979 policy memorandum which is simply as the court knows a memorandum which the office for civil rights wrote to itself and is used by office for civil rights monitors when they evaluate compliance with title nine no more than the office for civil rights is allowed to pick and choose which parts of the policy interpretation it wishes to enforce likewise the respondents and universities should not be allowed to pick and choose if the respondents are going to say as they do here that the three-part test provides a basis for evaluating these claims it frankly and candidly does not make sense to say that we should only take some language from the 1979 policy memorandum and I would say hold on let me ask you let me follow up oh sorry judge Graves you do you go ahead I do I guess a follow up so what about the 1996 clarification did that enshrine the three-part test as the exclusive means of assessing compliance or not well thank you for that question because I think it really supports our position because not only in the 79 memorandum or the interpretation but in the 1996 clarification it says quite explicitly that the three-part test is not the be all and the end all the three-part test is a great way to determine whether the absolute numbers are there in terms of participation but that's not the sole criterion for deciding whether there has been a violation and the 1996 clarification underlines that point the next point I'd like to raise is simply before you go there I wanted to I wanted to ask you about the I guess Chaylinor case where we said that the three-part test was entitled to I think we used the word controlling deference and under your view I think you're arguing for us to look at the entire policy guidance what would be the level of deference that we would owe would it be the same as what we said in Chaylinor or would it be something different in your view first of all I think what this court said in Chaylinor is that the the three-part test is entitled to what is known as our deference A-U-E-R deference because it is the agency's own considered evaluation of its requirements but again to get back to my preceding point that policy interpretation I think is entitled to equal deference but I really want to address the Chaylinor point because that is again a big part of the respondent's argument here they say that the circuit courts including this court have uniformly relied on the three-part test and we agree with that but I believe that it's necessary for the court to dig into that reliance a little bit and to reach an understanding as to why that's the case we would submit that it is the case because almost invariably the cases that have been brought under Title IX against colleges and universities in the United States have addressed the simple lack of participation by male and female students so that is as far as the courts have needed to go in a sense people who have challenged universities have pointed out in literally all of the cases cited certainly all of the circuit court cases cited that the colleges and universities did not reach the numerical thresholds which could be evaluated under the three-part test so the three-part test provided the basis for the court's decisions and the courts have not had to reach the issues posed by this case which is why I began my argument by saying this is a case of first impression counsel on the selection of sports I want to address this because you argue this in the contact sports so I'm going to kind of follow up on Judge Graza's point and ask a different question which is that part of the policy guidance talks about quote the opportunities for members of the excluded sex must have historically been limited and I searched the plaintiff's complaint for any evidence along those lines and found none in the complaint itself could you point me to anything in the complaint along those lines? well yes and I think we tried to address in the complaint the very issue your honor that you're addressing which points to the fact that in the state of North Dakota hockey is the number one sport and historically the men's team has existed I believe since the 1920s and the women's team was created in 1998 so between the 1920s and the 1998 women were excluded from participation in collegiate ice hockey teams the team was created in 98 and has done exactly what all of us would hope the creation of a women's team would do is that enough counsel? I mean the way it reads there are certain provisions of that policy guidance and to deal with teams in particular sports this does not appear to be one of them it tends to mirror the regulation itself which just talks about historical limitations so presumably it would be across sports that you would need to show that there's historical exclusion so I guess my question is is it enough to just show that there's exclusion in ice hockey and if so why? okay well I believe your honor that the requirement of exclusion certainly can be understood as you've suggested but I believe it can also be understood in the context of the other provisions because we're not simply relying on the contact sports provision we're also relying on the provisions that require scrutiny of the selection of the sports by the university and that's selection of sports contact sports and non-contact sports as well as the competition and we focused on those two issues I would say to a large extent simply because we wanted to show that every university is not the same if we were bringing this case against the University of Florida I doubt we would be arguing about ice hockey we would want to point out that here you have in North Dakota ice hockey is the number one sport that once this university created a team it participated not only among the 35 division one women's ice hockey teams in the country but the eight teams in its conference which is the most exclusive and successful and demanding conference for women's ice hockey North Dakota as well as Minnesota and Wisconsin and others and we pointed out that the women of North Dakota had satisfied by their participation and by their successful participation both the interest which is addressed by the regulations and by the level of competition I mean at the time this university cut off this team it was the sixth ranked women's ice hockey team in the United States and in context here we think the one point of comparison is the history of women's ice hockey in North Dakota but the second point of competition which does implicate the contact sports issue is by comparison to the men's ice hockey team which again existed for some 80 years before the women's team but is also and I think everyone in North Dakota understands this is a source of great pride and interest to young people in the state and that is why frankly we decided to bring this case because it seemed such a obvious point of objection that in the state of North Dakota the capital of ice hockey the university would choose to eliminate a sport which in some less than 20 years had achieved a status of prominence and success and was part of the phenomenon which again speaks to the regulations of interest, right? I mean, certainly in the upper Midwest interest in women's ice hockey is exploding as we allege in the complaint by virtue of participation in high school ice hockey as well as clubs and so on. So again, I don't want... Yes, sir. What do you say to the argument that the regulation on separate teams contemplates that there will be some contact sports teams for one sex that are not matched with a team for the other sex and therefore the policy guidance that purports to require offering a separate team conflicts with the regulation? Again, your honor, for example, we would not be arguing that North Dakota has to establish a tackle football team for women, okay? That's not our argument. But that's because you don't have sufficient interest, right? Isn't that why you aren't arguing for a football team? Otherwise you'd say it's required because you say the policy guidance is mandatory. Well, again, I think the policy guidance is equally mandatory in all of its provisions and that the requirement... And again, if I can... Let's go back to the football question. If there was interest among women to play tackle football, wouldn't your position require the university to offer a tackle football team for women? If there were young women playing tackle football in high schools across North Dakota and if there were young women playing tackle football in clubs and then coming to the university and demanding to play tackle football, none of which is true, but if those things were true, I think that's what we would be arguing. You think those things have to be true because that's necessary to demonstrate sufficient interest and ability to have those kinds of club and high school programs? I'm not sure those are the exclusive ways to establish that level of interest, but clearly not only the advice, not only the 1979 policy, but the regulations speak about interest and competition. So I appreciate the question, but we're not talking hypothetically. Not in a hypothetical, that's not this case, but if you could address whether the regulation contemplates situations where there are not separate teams and whether the policy guidance goes beyond the regulation and therefore should not be controlling. Okay. So the regulation, the regulation which we believe is controlling does require an institution to assess interest, history, levels of competition. So we don't need to go to the policy guidance to address those questions. To the extent to which the contact sport part of the guidance is not encompassed in the regulations, I do not believe the court needs to go there. We can rest our case and prefer to rest our case on the regulations themselves. And we think that the policy guidance may provide some help, but as your question suggests, your honor, it should not be the be all and the end all, especially if the court believes that the guidance is not always consistent with the regulation. So we'll go back to the regulation. And I did want to say one other thing about the three-part test, right? Is that the university's position would require absurd results if the three-part test is the only basis for making determinations. And I like our hypothetical there. Imagine if a university has 200 athletic spots for men and women. And for the men, has football teams, basketball team, ice hockey, baseball, a variety of sports. And for women, it has cross-country running. But the participation numbers are the same. I do not believe that that would be a lawful result if challenged in court, although it would be consistent with the three-part test. Would you care to save the remainder for rebuttal? I would, sir. Thank you. All right. Thank you for your argument. Mr. Cohen, we'll hear from you. Thank you, your honor. Good afternoon. And may it please the court. My name is Dan Cohen with the law firm of Nelson Mullins, and I'm a special assistant attorney general for the state of North Dakota. This afternoon, representing North Dakota University System as well as its member institution, the University of North Dakota. As Mr. Siegel has enunciated, this case is not about a potential violation of law. The appellants have admitted that at this point, and the district court found that. Instead, this case is about the appellant's attempt to invent new law that flies in the face of 40 years of judicial and agency precedent. Before opening up for questions, of course, you're welcome to ask me at any time, but I did want to give a brief overview of what we think our core arguments are. First, what the law requires. It is regulatory, 34 CFR 106.41C1. State asks the question of whether the selection of sports and the levels of competition effectively accommodate the interests and abilities of members of both sexes. There are a lot of other provisions of Title IX. It covers sexual discrimination in pregnancy, sexual misconduct, equitable treatment, a number of different things that are simply not at issue in this case, as the district court found in its order at page eight. But fortunately, when it comes to this provision of C1, we have decades of judicial case law, including from this court, interpreting that that standard is satisfied via exclusively the three-prong test. This court has referred to the three-prong test, and in particular, prong one, as a safe harbor. Now, again, we do not contest that this is the be-all and end-all. There are other provisions of Title IX, and even under C1, there's a separate levels of competition standard, but that's also not an issue under the student-athletes' pleadings. So this court has declared that if an institution has met any part of the three-part test, the institution is meeting this equitable athletic participation requirement under C1. Furthermore, the implementing agency, to the extent that Mr. Siegel wishes for you to look at a 1979 policy interpretation, our motion to dismiss, as well as our reply brief, clearly enunciated that this is not, in particular language, that even the agency itself defers to, while he asks you to look back to 1979. The 1996 clarification, 2003 guidance, 2010 guidance from the Office for Civil Rights of the US Department of Education, all have exclusively relied upon the three-prong test for purposes of measuring compliance under C1. And in particular, the 1990 OCR manual also laid out, in particular, to defeat the notion that parity and offering the exact same sports was required. And we can quote from that for you in a moment. But to the extent that appellants urge this court to consider their student-athletes, the hockey players, individual athletic interests and abilities, that is provided under Title IX. And frankly, it is provided under the controlling three-prong test. It is found within prong three. A school that does not meet prong one, and a school that does not meet prong two, then must slide down to prong three, whereupon it must be able to demonstrate that it is meeting student-athletes' athletic interests and abilities. Council, if that's the case, then how would you address Mr. Siegel's hypothetical? I would go back to the football analogy. On campuses across the country right now, we do have 100 athletic opportunities provided to male football players. There is nothing wrong with that. There is no parity requirement, and we have court after court after court, which is to declare that there is no particular right to play sports in college, much less to a particular sport. So, Council, if the University of North Dakota has 200 participant opportunities, and for men, those are in football, basketball, and hockey, would it be compliant with Title IX if they offer 200 opportunities for women in synchronized swimming and cross-country and some other non-contact sport? Ultimately, Your Honor, that is a question that is provided for under the regulatory language of 1975. However, it falls under 34-106-41-C-2 through C-10. We're effectively looking at whether or not student-athletes are receiving equitable treatment under that hypothetical. Is a synchronized swimmer receiving a comparable opportunity to that of, and for purposes of this example, we're assuming a high-profile football team. But ultimately, if you had an Olympic synchronized swimming team for women, and it was receiving high and equitable treatment, it may well be receiving comparable treatment to a football team. So I don't want to put stereotypes into this hypothetical, but ultimately, that question is a question about equitable treatment. It is not about participation opportunities. And this court has held that participation opportunities are exclusively measured under the three-pronged test per the challenge bar paper. So counsel, what is this court to do then with the contact sports provisions of the guidelines? Honestly, I think the same thing that courts for 40 years have done and that OCR itself has done. It is not a provision that is relied upon anymore. OCR walked away from it in 1990. Again in 96, again in 2003, frankly it was 2005 guidance that walked away from it that was later repealed by 2010 guidance. The contact sport exception, if we want to go back to the original regulatory language, which I believe is where you're, perhaps where you're starting in regard to separate teams, it is permissive. 34-106-41-B in regard to separate teams is entirely permissive, notwithstanding the requirements of paragraph A, a recipient may operate or sponsor separate teams for members of each sex, where selection of sports is based upon competitive skill or the activity involved as a contact sport. Beyond that, the second sentence of sub B, first of all, it is dependent upon the same issue as prong one, where a recipient operates or sponsors a team for a particular sport and the athletic opportunity for members of that sex have previously been limited. Then we have to look at a parity requirement unless the sport involved is a contact sport. But as we look to historical limitations or previous limitations, we again have to come back to the controlling three-prong test, which is written in the present tense, your honor. Yeah, so suppose we think the contact sport selection of sports provision is operative. We disagree with you and we want to apply it here. Does the university meet it? And why, if so? Does the university meet it? Does it satisfy this particular requirement? And I'm sorry, your honor, are we referring back to the regulatory contact sports language? We're relying, I'm following up on Judge Graz, which is the policy guidance. That he was asking about the contact sports provision. Right, thank you. Right, under the 1979 policy interpretation contact sports exception, again, there's a prerequisite that the appellant's pleading fails to meet. And again, it is comparable to prong one. Under the 1979 policy interpretation language for contact sports, it says that it must do so for members of the other sex. Okay, it's that must that we contend makes it unenforceable. However, it must do so for members of the other sex under the following circumstances. Number one, the opportunities for members of the excluded sex have been historically limited. We are again back to the failure of prong one. If we have numerical proportionality as the University of North Dakota has here, as the appellants have failed to allege under the Paul Twombly standard, and as a matter of public record, UND did comply with prong one. So that prerequisite fails. Therefore, the contact sports language of even the 1979 policy interpretation is inapplicable. What do you mean when you say as a matter of public record, is it a matter of public record that there was no historic limitation on opportunities for women in North Dakota? Thank you, your honor. That's an excellent question. I would think it'd be the opposite, but. What happened here from, so there are a number of public documents that public universities are required to produce on an annual basis. And one in particular is called the Equity and Athletics Disclosure Act Report. Also following the elimination of the women's hockey team, UND was subject to two different OCR investigations related to the same thing. What happened here historically was during the 2015-16 academic year, cycle number one, the University of North Dakota eliminated its baseball team. And following that elimination, men were the underrepresented gender within athletics at the University of North Dakota. Where Mr. Siegel's narrative picks up is in cycle number two, year number two for the 2016-17 academic year, where the comparably sized women's hockey team was eliminated. Men were the underrepresented gender at UND prior to the cut. And following the cut, we had statistical proportionality and compliance with prong one. This is a matter of public record, both via the EADA reports, Equity and Athletics Disclosure Act reports, which UND was required to release. It also was via the OCR case where UND was investigated. But most importantly, it was not alleged in the appellant's complaint. They fail at baltwombly to even allege that we were not proportional under prong one. And as this court has enunciated in the Chaloner case, prong one provides a safe harbor. In the absence of any allegation that we violated prong one, and as a factual matter, we didn't violate prong one, you don't get to the rest of the analysis. Well, you're talking about the three-part test now. I thought we were still on the policy guidance. Yes, Your Honor. And what opportunities for members of women had historically been limited. You're saying that's not true as a matter of public record because the baseball team was eliminated in the 90s, but wouldn't historically refer to a longer time period than that? No. No. No, Your Honor, I'm sorry. The baseball team was eliminated the year before women's hockey was eliminated. The Chaloner case was concerning the elimination of men's wrestling several years prior. So really what this comes down to is what does it mean to be historically limited? The plaintiffs admitted that they have no evidence, they have presented no evidence prior to the year 2002. That's the motion to dismiss reply brief at page 18. So their own history does not bring us forward past 2002. And as a matter of public record, the year before the women's hockey team was eliminated in 2015, 16, men were the underrepresented gender at UND. That's a matter of public record. In the year that women's hockey was eliminated, we achieved statistical numerical proportionality in compliance with prong one. What about between 1928 and 1975? What does the public record show about that? We haven't gone back that far because it's not relevant. We contend under the language of the remainder of, so again, our contention is that this particular language from the policy interpretation is not operative. It is not law. It was never, you know, signed into law. We know all that, but we were talking, we were assuming a few things for the sake of this discussion, which got us down to whether this policy guidance would be met if it is binding. And you were saying, no, it's not met because women have not historically been limited. And you started talking about the baseball team and so forth. And so my question is, isn't it obvious that women's opportunities historically were limited between 1928 and 1979, such that if this guidance really were binding, that that prong would be satisfied? Or not, maybe not. Thank you, your honor. I apologize, I misunderstood the earlier question. What I was trying to get to, and let me take a step back, is that the language from the policy interpretation here is not law to begin with, regardless of whether or not we defer to it. However, the word historical has never again been utilized in any of the guidance. And that's where I was trying to take my argument. If we look at the regulatory language, which also deals with the contact sports exception under sub B, it does not use the word historically. We are not looking to the 1920s. We are not looking to 1979. It uses the word previously. Was there an under-representation previously? Which means that there has to be a- Policy guidance that the plaintiff is citing here does use the word historically. And the question has been raised whether that's satisfied in this case, if it is binding. So we have to talk about what historically been limited means. And our argument is that to the extent the word historically could conceivably relate back to 1979 and prior, it is inconsistent with the regulatory language, which does not use the word historically and instead uses the word previously. Frankly, I do not know the answer with respect to 1979 and prior. The plaintiffs, the appellants did not argue it. And so it fails at Baltwombly. We don't have an allegation that takes us in the other direction. But I will note that the current language that this court has adopted and this court has held to be a safe harbor uses the present tense. Not historically, not previously, but current tense. Prong one states under the Shalinor opinion, whether intercollegiate participation opportunities for male and female student athletes are provided in numbers substantially proportionate to their respective enrollment. It is a one-year snapshot. And we do comply with respect to the one-year snapshot. So we have a cascade of historical in a non-law 1979 memo, as Mr. Siegel called it, to never again adopting the word historic. Instead, we use the word previous in the regulatory language sub B. But then ultimately we have this court's opinion in Shalinor, which takes us to the present tense, whether they are underrepresented. And it is public record that women are not, or at least at the time that this litigation arose, were not the underrepresented gender. Council, let me see if I could clarify something. As I understand your position, it's that if a program has numerical participation parity, if that is a safe harbor, regardless of whether the program offers zero contact sports for women. That is correct. There's no magic to contact sports as opposed to other sports. What ultimately matters is either numerical proportionality under prong one, or as Mr. Siegel has argued, do we measure the interests and abilities of the underrepresented gender? So their choices, their decisions matter. Number one, if there is an underrepresented gender, which there is not here, but then it cascades through prong one into prong two. And then ultimately the university also fails prong two, then under prong three, the university can only comply if it is able to demonstrate that it is currently meeting the athletic interests and abilities of the underrepresented gender. Beyond that- You're never going to get to prong two or three if they comply numerically with prong one. Correct. So it's absolute immunity. This court has called it a safe harbor under the Chaloner opinion. Is it a safe harbor though for everything or just for the effective opportunity prong? Couldn't the plaintiff still say, you're not giving us decent locker rooms and travel and all the rest, whereas you're giving the other sex those things in the contact sports? Wouldn't that still be a base? Yeah, so the safe harbor wouldn't eliminate that kind of claim. Absolutely correct. But those issues are not before this court. Our district court on the motion to dismiss page eight held that none of the provisions of C2 through C10 were an issue under the student athletes pleadings. Right, I just wanted to clear up when we talk about absolute immunity, we're only talking about on one portion of the statute or the regulations, right? Absolutely correct. It's a safe harbor in that one respect. Absolutely correct, that is correct. But ultimately our position is that student athletes do not have a right to participate in athletics. We have multiple cases that have held that within the circuit Ganya versus Drake University, open quote, title nine does not establish a right to participate in any particular sport in one's college. We have that in the Miami University case out of the sixth circuit. We have the fourth circuit equity and athletics case. But moreover, in these types of cases where we're dealing with equitable participation opportunities and the elimination of certain teams, we have court after court after court holding that there's no right to a given team, such as ice hockey. But let's go back to an even more extreme version of the earlier hypothetical, which is suppose there are 10 teams for men and 200 participation opportunities. And there is one team for women and 200 participation opportunities. Would you say that that's completely fine under prong one? And even though men have 10 times the options of different sports, that that selection of sports meets a safe harbor and therefore there's absolute, absolutely no liability? That does present a difficult hypothetical, but I can tell you that in university athletic departments across the country, you have a parallel to that. For the most part, you're looking at a men's athletics program of only approximately six sports because football occupies 100 of those roster spots. Whereas women's athletic opportunities, at a minimum, you're looking at nine, 10 women's teams at most universities, sometimes 12, sometimes 14, in part because they're trying to offset the number of football players. But there's nothing whatsoever wrong with a school that offers football, basketball, baseball, and track for men and 12 sports for women with more diversification of those opportunities. There's nothing wrong with that. What I'm getting at is that maybe the selection of sports provision and both the regulation, maybe the policy guidance, I don't know, we have to decide that, does some work there, which is to say when there's sufficient interest, maybe having one sport for women when there's 10 sports for men means there should be more sports for women in order to comply with Title IX. What's your response to that? I think that the Supreme Court has set forth clear guidance that we should not abandon well-known precedent across every single judicial circuit as well as OCR itself to change the rules 40 years down the line when it is universally accepted that the three-prong test provides the test for equitable participation opportunities. And so to change course here 40 years later, I don't think Mr. Siegel's pleading has given us sufficient grounds to step away from 40 years' worth of agency as well as judicial precedent. Okay, thank you for your argument, Mr. Cohen. Mr. Siegel, we'll hear from you in rebuttal. Thank you very much, Your Honor. First of all, perhaps I want to point out what's obvious is that the university has not responded to the question of 200 men in 10 sports, 200 women in another, and that's because their position would be rendered illogical if they said anything. I think he responded by saying it could be sufficient, but you'd have to have a sport that where 200 women were really interested in participating and it would have to be sort of a reverse football analogy doubled. It's just not a realistic hypothetical because there's no such sport. Okay, but- Am I- That is correct, but the problem with relying on the three-part test as mechanically as the university does is that the example raised by that hypothetical cannot be answered. And I do want to point out that the United States Supreme Court has never opined on the three-part test, much less has never said that the three-part test is the basis for determining compliance with Title IX. And I want to repeat that in the 1996 OCR clarification at Section 1B, OCR says, compliance with the three-part test is not sufficient to show compliance. And that is because getting away from the policy advice or memorandum, when you look at the regulation, particularly Section 8841C1 requires consideration of whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes. And compliance with those provisions is not met by showing that there are an equal number of men and women in your athletic programs. And that is what we have focused on in our complaint. We have not alleged a violation of the three-part test. What we have alleged is that UND in paragraph 45 of the complaint failed to consider, which required the athletic interests and abilities of women, the level of competition, the level of interest, the performance records, the historical limitations and the interest and ability. And that's why in our complaint, we focus so much on showing that this is not a situation where one size fits all. We think it's necessary in evaluating the University of North Dakota's compliance with Title IX is to think of what is the case in North Dakota concerning history, interest of women, but also the evolution, right? We would not be doing complete justice to the situation unless we understood. No trap door here. Sorry, unless we understood that there is a change in our society and that that change exists in North Dakota as young women are playing ice hockey and want to play competitively at the interscholastic level. And we think UND has violated their rights by making the decision they made without considering these factors required by Title IX and the implementing regulations. Council could, with Judge Powelson's permission, I just have a, I wanted to ask you about what opposing counsel said, which was when we were talking about historical, I want to know if there's any allegations at all about historically, whether the excluded sex here women, there's been less opportunity. In other words, the first part of the selection of sports policy items. Well, Your Honor, to be very candid with you, this is not, this is an issue that requires further investigation on our part. Historically, we focused on the issue of ice hockey because that's what we know about. And we know that before 1998 was a lot of history when men's interest in ice hockey was accommodated and women's interest in ice hockey was not even on the table for conversation. Okay, thanks. Okay, thank you to both counsel for your arguments. The case is submitted.